**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **CENTRAL SCHOOL DISTRICT,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 11-6869** |
| | : | |
| **K.C., by and through his parents, S.C. and S.C.,** | : | |
| | : | |
| **Defendant.** | : | |

---

**Goldberg, J.**                                                                            **July 3,   2013**

<u>**Memorandum Opinion**</u>

This case arises under Section 615(i)(2)(B) of the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.  Plaintiff, Central School District (the "District"), has appealed the decision of the Special Education Due Process Hearing Officer ("Hearing Officer"). In that decision, the Hearing Officer found that the District failed to meet its Child Find obligation under the IDEA, and awarded Defendant, K.C. (alternately "Student"), compensatory education.  The District argues that the Hearing Officer's finding of a Child Find violation is legally erroneous and unsupported by the record, that the compensatory education award violates the IDEA's two-year statute of limitations and that the award of partial reimbursement for a summer reading program is unjustified.  For the reasons that follow, we disagree with the District and will affirm the decision by the Hearing Officer.

**I.       Factual History**

At the time of the Hearing Officer's decision, K.C. was an eleven-year-old student in the Central School District in Bucks County, Pennsylvania.  (H.O. Op., F.F. ¶ 1.)  K.C. began attending school in the District in first grade, where he was enrolled in general education classes.

From the beginning of his first grade year, K.C.'s teacher recommended that he receive educational accommodations to help him develop basic academic skills, particularly reading. K.C. was referred to the Early Literacy Lab, was enrolled in the Basic Skills Lab Reading program, attended small group reading support instruction called STARS, and received supplemental materials and assistance with organization in the classroom. K.C.'s teacher also pre-taught him and re-taught him content. (H.O. Op., FF ¶ 5; R. at J-4.) Additionally, to support development of fine motor skills, K.C. was enrolled in a program called Helping Hands. (R. at J-60.)

Despite these accommodations, K.C. lagged behind his peers in math and writing, and his teacher was concerned about his ability to focus. (H.O. Op., FF ¶ 5; R. at J-4, J-9 and J-10.) With his parents' approval, K.C.'s teacher referred him to an Instructional Support Teacher (IST) tasked with providing a more structured academic support program. (N.T., pp. 961-62.) Working with K.C.'s parents, the IST decided to enroll K.C. in the Reading Recovery Program and the Writing Lab. (H.O. Op., FF ¶¶ 6, 9.) In March 2007, based on K.C.'s performance on the Developmental Reading Assessment ("DRA"), the IST determined that K.C. had improved enough that he would not require structured academic support in reading and writing in second grade, although the IST recommended continuing other regular accommodations. (H.O. Op., FF ¶¶ 9, 11.)

The IST's recommendations were followed when K.C. entered second grade, and he received a number of accommodations and supplemental programs. K.C. was enrolled in the Basic Skills Lab for reading, which consisted of working with a reading specialist twice per week throughout the entire school year. (H.O. Op., FF ¶ 13; N.T., pp. 64, 75.) He also

participated in the Sonday reading program,[1] which focuses on phonological awareness, twice weekly between September 2007 and February 2008. (N.T., pp. 144-45; R. at J-14.) For writing, K.C. was referred to the Writing Lab to work on conventions such as capitalization, punctuation and neatness. (R. at J-4; N.T. pp. 67-68.) While other students were also referred to the Writing Lab, K.C. was the only student who participated in the program for the entire second grade school year. (H.O. Op., FF ¶ 16; N.T., pp. 69-70.) K.C. also received math tutoring twice per week, participated in the Basic Skills Lab math program and worked in small groups outside of class with an educational assistant. (N.T., pp. 70-74; H.O. Op., FF ¶ 16.) In the classroom, K.C. received supplemental small group instruction for phonic awareness of words, reading, language arts and math, and was pre-taught and re-taught material. (H.O. Op., FF ¶¶ 13-17.) All of these accommodations and programs supplemented the education received pursuant to the normal second grade curriculum.

K.C.'s progress throughout the second grade year was assessed partly by classroom testing administered by his teacher. In March 2008, in preparation for an end of the year meeting between the teacher and parents called a "Portfolio Conference," K.C.'s teacher sent his parents a progress report. The teacher indicated that although K.C.'s effort and work habits were satisfactory, his academic progress was not, and K.C. was not proficient in either reading or language arts. (R. at J-15.) K.C.'s teacher also expressed concern with his handwriting and periodic inattentiveness. (H.O. Op., FF ¶ 18.) Similar issues were reported on K.C.'s end-of-the-year report card. (R. at J-18.) While the report card indicated "satisfactory" performance in

_____

[1] Sonday is similar to Orton-Gillingham instruction. K.C. received this instruction from an educational assistant, and not a regular or special education teacher or reading specialist. (N.T., p. 706.)

all academic areas, and his teacher found that K.C. had met "most" of the second grade benchmarks, she also indicated that K.C. needed to work on the neatness of his handwriting and recommended that he work on fluency and comprehension in reading over the summer to prepare for third grade. (Id.)

In addition to classroom evaluations, K.C.'s reading ability was tested four times using the DRA, which consists of testing for comprehension and fluency. (See R. at P-1A, p. 2.) In all four tests, K.C. scored "proficient" in comprehension at his grade level, but was not proficient in fluency on either the September 2007 or May 2008 tests. Indeed, at the end of second grade, K.C.'s fluency was at the level expected of students in the middle of the year. (R. at P-1A, p. 2.)

With the exception of the Sonday program, every accommodation provided to K.C. in second grade continued in third grade. He continued to attend the Basic Skills Lab for both reading and math, receive instruction in the Writing Lab, and was pre-taught and re-taught material. (R. at J-20.) He also continued to receive small group instruction and supplemental material. (Id.) K.C.'s second and third grade teachers testified that although K.C. had met the benchmarks for appropriate progress at the end of second grade, they felt that he should continue to receive these accommodations because they had benefited his education. (H.O. Op., FF ¶ 23; N.T., pp. 90-91, 236-38.) Additional accommodations were also provided to K.C. in third grade. He was assisted with organization, and given study guides for language arts and math. He was also allowed to respond orally to classroom assessments in language arts and reading, and was given re-tests in math.[2] (H.O. Op., FF ¶ 20.)

_____

[2] These assessment accommodations were not used for every test throughout the school year. Rather, when K.C. struggled with an assessment independently, he was re-tested by his teacher with accommodations. (H.O. Op., FF ¶ 20.)

With these additional accommodations, the classroom assessments of K.C.'s academic performance in third grade showed progress in some areas, but continuing weakness in others. He improved in his use of punctuation and capitalization, and, with accommodations like graphic organizers, was able to write a sequential story by the end of the year. (H.O. Op., FF. ¶ 24.) In K.C.'s April 2009 Portfolio Conference Report, his teacher reported that K.C. was proficient in math based on third grade benchmarks, but not in reading or language arts. (R. at J-22; N.T., pp. 326-28.) His teacher also testified that K.C. showed outstanding effort throughout the year, and made progress in independently applying strategies developed during small group work. (N.T., pp. 226, 324-28.) On his spring report card, K.C. received letter grades in reading, writing and math based on his performance with the accommodations provided by the District. K.C. earned B's in reading, C's in writing, and two C's and one B in math. (R. at J-23.) By the end of the fourth marking period, K.C.'s teacher felt that he had improved throughout the year and met the District standards for reading, writing and math. (H.O. Op., FF ¶ 27.)

Objective testing also reflected progress in some areas, but not in others. K.C.'s performance on the Pennsylvania System of School Assessment (PSSA) exam in Spring 2009 showed that he was proficient in both reading and math. (R. at J-21.) However, other tests indicated persisting problems with reading fluency. On the October 2008 DRA, K.C.'s fluency score was only 69 words per minute, barely within the proficient range. (R. at P-1A, pp. 2-3.) When K.C.'s fluency was re-tested using the Oral Reading Analysis ("Minute Read") in April 2009, his fluency was still only 69 words per minute, which was now well below the expected range for a student his age, and his comprehension was just 50%. (Id.)

Fourth grade in the District marks an important shift in academic focus, and the emphasis of the curriculum shifts from "learning to read" to "reading to learn." (H.O. Op., FF ¶ 30.)

From the start of the fourth grade year, K.C. experienced difficulty meeting these academic expectations. He skipped words when reading, and his comprehension of text was below 70%. (Id.). A September 2009 DRA requested by K.C.'s teacher revealed that although he read with 94% accuracy, he was "instructional" rather than "independent"[3] at a fourth-grade reading level and his fluency was 52 words per minute, well below the acceptable range of 71-124 words per minute. (R. at J-33.) When writing, K.C. continued to have difficulty using correct punctuation and capitalization. (Id.) After noticing these continued difficulties, and talking with K.C.'s third grade teacher, K.C.'s fourth grade teacher continued the accommodations K.C. previously received, and implemented additional ones. K.C. was now pre-taught and re-taught material in math, language arts and reading, and worked in an isolated area to help him focus. He was also provided study guides and was re-tested in social studies because his reading difficulties impeded his ability to learn the material quickly. (H.O. Op., FF. ¶ 31.) Additionally, K.C. worked on cursive handwriting with his teacher after school once per week. (N.T., pp. 430-31.)

K.C.'s parents met with his teacher in November, and discussed their concerns about K.C.'s academic issues. Specifically, they were bothered by K.C.'s increased reliance on accommodations, and his failure to become a more independent learner. (H.O. Op., FF. ¶¶ 31-32.) K.C.'s parents testified that fourth grade homework was very difficult for K.C., and often took him two or three hours to complete. K.C.'s teacher recommended continuing the accommodations, and worked with his parents to develop strategies to help cope with the most difficult homework assignments. K.C. continued to struggle with homework, however, and his

---

[3] "Instructional" means a student is able to read the passage with instruction. According to K.C.'s fourth grade teacher, a student's independent level is usually a half-year to a year behind his instructional level. (N.T., p. 395.)

teacher eventually recommended that K.C. be limited to forty minutes of work each night, regardless of whether he had completed the assignments. (H.O. Op., FF. ¶ 34.)

Following the November parent-teacher conference, and after meeting with a pediatrician, K.C.'s parents asked the District to evaluate him for a learning disability. (H.O. Op., FF ¶ 35; R. at P-6.) Initially, the District declined to evaluate K.C., and referred him to an IST instead. (H.O. Op., FF ¶ 36; R. at J-26.) K.C.'s parents were provided with a form to report his strengths, weaknesses and attitude toward school, and their concerns about his academic performance. (H.O. Op., FF ¶ 36.) The District also conducted an academic screening that included aptitude tests and observation of K.C.'s performance in the classroom, both in large and small group settings. (Id., FF ¶ 40.) K.C. performed in the average range in most of the tests, although some weaknesses in reading and writing were evident. (R. at P-4.) For example, K.C. had difficulty offering written responses to questions, and his rate of reading and level of reading comprehension were well below what was expected in fourth grade. (Id., p. 4.) During the classroom observations, it was noted that K.C. did not participate as much as other students, particularly in large group settings. (Id., pp. 5-6.) Following this screening, the IST recommended that continuation of the accommodations already being provided was sufficient. (H.O. Op., FF ¶ 40; N.T., pp. 850-53.) Nonetheless, on December 22, 2009, the school issued a "Permission to Evaluate" ("PTE"), authorizing an assessment of K.C. for a learning disability. His parents agreed to the evaluation on January 4, 2010. (H.O. Op., FF ¶ 35.)

The evaluation requested by K.C.'s parents took place in March 2010. It incorporated the results from the IST's December 2009 academic screening, and was supplemented by other assessments, including portions of the Wechsler Intelligence Scale for Children (WISC-IV), the Reynolds Intellectual Assessment Scales (RIAS) and the Wechsler Individual Achievement Test

(WIAT-II). (H.O. Op., FF ¶¶ 44-45.) The WISC-IV, which assesses intellectual ability, indicated that K.C. had "high-average" intelligence, and the RIAS, a measure of academic potential, indicated that his verbal intelligence was in the "High Average" range, and that his nonverbal intelligence was "Average." (Id., FF ¶ 44; R. at J-33, p. 7.) The WAIT-II, which measures achievement, showed that K.C.'s performance was average or above in reading, writing and math. (R. at J-33, p. 14; H.O. Op., FF ¶ 45.) The evaluation also included a speech and language screening that revealed K.C. had age-appropriate abilities. (H.O. Op., FF ¶ 45.)

As part of the evaluation, the District also surveyed K.C.'s teachers and his parents for signs of attention deficit disorders using the Connors 3rd Edition rating scale. Only one teacher reported a high score for these symptoms, while the parents' ratings were elevated for most indicators. (Id.) Other than the Connors questionnaire, parental input was not considered during the evaluation, although an input form was provided at the meeting to review the result of the District's evaluation, and K.C.'s parents were told that their responses would be incorporated into the final report. (Id., FF ¶ 46.)

Following the evaluation, the District's psychologist concluded that K.C. did not have a learning disability that qualified him for special education under the IDEA. The District also determined that K.C.'s weaknesses in attentiveness, hyperactivity and impulsivity could be accommodated in the regular classroom setting through the use of organizational support, shortened assignments and extended time to complete assignments. (Id., FF ¶ 48.)

K.C.'s parents disagreed with the District's determination, and requested occupational therapy and independent neuropsychological evaluations, as well as extended school year (ESY) services. (Id., FF ¶ 49.) The District agreed to the additional evaluations, and they were performed in April and May of that year. The neuropsychological examination determined that

K.C. had developmental dyslexia and dysgraphia, which are significant language-based learning disabilities. The occupational therapy evaluation found that K.C. suffered from a lack of focus, disorganization and impulsivity, and has significant difficulties in visual perception and fine motor coordination. It concluded that although these issues did not demonstrate an identifiable disability, they were likely to significantly impact his academic performance, particularly with respect to reading and writing. (Id., FF ¶¶ 51-52.)

After these additional evaluations were conducted, the District issued a "Re-evaluation Report" on June 23, 2013, reversing its prior determination and concluding that K.C. was eligible for special education. (R. at J-100.) It based this determination upon its review of all the testing, as well as K.C.'s continuing academic difficulties during the last quarter of his fourth grade year. The District proposed that K.C. follow an Individualized Educational Plan ("IEP") that included an at-home ESY program consisting of one hour of Orton-Gillingham reading instruction per week. (Id., FF ¶ 53.) The Supervisor of Special Education informed K.C.'s parents of the District's proposal, and told them that ESY services would not be available unless an IEP was agreed upon. (N.T., pp. 786-88.)

K.C.'s parents refused to agree to the District's proposed IEP, however, because they believed that one hour of reading instruction per week was insufficient to adequately address K.C.'s disabilities. Without an agreed-upon IEP in place, the District refused to provide ESY services and K.C.'s parents enrolled him in a summer reading program at a private school. Following K.C.'s participation in the reading program, his parents decided to enroll him at the private school for fifth grade. (H.O. Op., FF ¶ 56.)

**II.      The Hearing Officer's Decision**

K.C's parents filed a due process complaint on his behalf on February 16, 2011, asserting that the District had failed to meet its Child Find obligation and requesting compensatory education. The Hearing Officer heard five days of evidence in May and June 2011, which included testimony by K.C.'s second, third and fourth grade teachers, a reading specialist, psychologist and special education supervisor from the District, as well as a neuropsychologist testifying on behalf of K.C., and K.C.'s mother.

After consideration of the testimony and the extensive documentary evidence submitted by the parties, the Hearing Officer determined that the District had violated its Child Find obligation, and should have evaluated K.C. for a learning disability by the end of K.C.'s third grade year, "at the latest." (H.O. Op., pp. 20-21.) Her conclusion was based primarily upon her finding that the District had a "singular focus on . . . progress toward and achievement of grade level benchmarks" rather than considering academic progress together with other objective assessments, and within the context of the numerous academic accommodations that K.C. was being provided. (Id., pp. 15-16.) The Hearing Officer noted that testimony by District employees showed they believed that "a need for special education cannot arise until and unless school performance is significantly impaired," even when performance is buttressed by significant regular educational supports. (Id.) The Hearing Officer placed particular emphasis on the testimony by K.C.'s third grade teacher that she would not suggest an evaluation for a learning disability so long as a student was progressing toward grade level benchmarks. (Id. (citing N.T., pp. 224-25).)

The Hearing Officer found that the District's undue emphasis on K.C.'s performance on classroom tests prevented it from recognizing clear indications that K.C. had a learning disability

as early as his second grade year. She noted that despite receiving significant accommodations during that academic year, including receiving twice the amount of specialized writing and small group reading instruction as other students, and working with a reading specialist, K.C. continued to have significant problems with both reading and writing. (Id., p. 19.) According to the Hearing Officer, the need to evaluate K.C. for a learning disability became even more prominent in third grade, when more educational supports were necessary to allow K.C. to keep up academically. (Id.) In short, the Hearing Officer found that K.C.'s need for additional academic supports as he progressed through second and third grades indicated that those supports were failing to make him an independent learner, and the District should have considered how K.C. would fare as academic demands continued to increase. The Hearing Officer concluded that K.C.'s increased need for accommodations, and his continuing academic problems despite those accommodations, should have alerted the District of the need to evaluate K.C. for a learning disability. (Id., pp. 15-16.)

Although the Hearing Officer found that the District should have suspected K.C. of having a learning disability and evaluated him during his second grade year, she recognized that the IDEA's two-year statute of limitations permitted her only to consider violations that occurred after February 16, 2009—the middle of K.C.'s third grade year. She therefore noted that the District had violated its Child Find duty, at the latest, by the end of K.C.'s third grade year. (Id., pp. 20-21.)

As a remedy, the Hearing Officer awarded compensatory education based upon recommendations made by the neuropsychologist who testified for K.C. at the hearing. (Id., p. 22.) She noted that the neuropsychologist, who examined K.C. when he was entering fifth grade, recommended thirty to forty minutes of phonemic awareness and fluency instruction per day, as

11

well as three thirty-minute occupational therapy sessions per week. The neuropsychologist opined that this level of instruction was necessary to allow K.C. to catch up to other students before entering middle school. Based upon this testimony, and her understanding that K.C. was two years away from middle school, the Hearing Officer awarded forty minutes of daily reading instruction, and ninety minutes of weekly occupational therapy, for the duration of two 180-day school years. (Id., pp. 23-24.)

The Hearing Officer also determined that the ESY program offered by the District was improper because it was conditioned upon K.C.'s parents agreeing to an IEP for the school year. The parents' refusal to agree to the IEP was not a proper basis to refuse to provide ESY services, and the Hearing Officer accordingly awarded the parents the amount it would have cost the District to provide ESY tutoring. (Id., p. 23.)

## III.    Legal Standards

"Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." Neena S. v. Sch. Dist. of Phila., 2008 WL 5273546, at * 5 (E.D.Pa. Dec. 19, 2008) (quoting Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 757 (3d Cir. 1995)). District courts apply a "modified de novo" standard of review to the Hearing Officer's factual findings, and are required to give them "due weight." Id. (citing S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003)). Under this standard, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." Id. (quoting Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001)). Factual findings made by the Hearing Officer are to be considered prima facie correct, but the district court may

disagree with those findings if it explains its basis for doing so.  Id. (quoting M.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 530-31 (4th Cir. 2002) (citations omitted)).  The court "must accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion."  Id. (citing L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 n. 4 (3d Cir.2006)).

The district court is not bound by the Hearing Officer's conclusions of law, and the application of legal standards at the administrative hearing are subject to de novo review.  In re Educational Assignment of Joseph R., 318 Fed.Appx. 113, 118 (3d Cir. 2009).  However, the district court is not to substitute its own notions of educational policy for those of local school authorities.  Id.

At the administrative level, the party seeking relief—here the Parents—has the burden of proving a violation of the IDEA.  Schaffer v. Weast, 546 U.S. 49, 62 (2005).  However, "the party challenging the administrative decision bears the burden of persuasion before the district court."  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012).  Accordingly, the District bears the burden of showing that the Hearing Officer's decision was erroneous.

## IV.    Discussion

The District seeks a complete reversal of the Hearing Officer's decision, arguing that the record contains "compelling evidence" that K.C. made "substantial progress" during his second, third and fourth grade years with only general educational supports.  (Pl. Mem., Doc. No. 8, p. 1.)  The District asserts that the Hearing Officer's conclusion to the contrary is based upon application of an incorrect legal standard and factual findings that are unsupported by the record. The District also challenges the Hearing Officer's award of two full academic years of compensatory education, and partial reimbursement for ESY services following K.C.'s fourth

grade year. It argues that the IDEA's statute of limitations limited any such award to an hour-for-hour replacement of services that should have been provided between February 16, 2009, and the end of K.C.'s fourth grade year in June 2010. With regard to the award of reimbursement, the District asserts that K.C.'s parents never had any intention of accepting its offer for ESY services and instead voluntarily chose to enroll K.C. in a private program for the summer.[4]

K.C. disagrees with the District and asks that the Court affirm the Hearing Officer's decision. He argues that the District's challenge to the Hearing Officer's decision improperly focuses upon whether general accommodations resulted in educational progress rather than whether the need for increased accommodations coupled with K.C.'s academic performance should have alerted the District to the need to evaluate K.C. He asserts that the record contains ample evidence showing that these circumstances should have led the District to evaluate him for a learning disability by the end of third grade, at the latest. K.C. defends the Hearing Officer's compensatory education award by arguing that it was properly focused upon providing services that would put him in the educational position he would have been in absent the District's violations, rather than providing an hour-for-hour replacement of services the District failed to provide. Finally, K.C. argues that the District has offered no basis to overturn the award of reimbursement for ESY services, but instead simply disagrees with the Hearing Officer's factual findings.

---

[4] The District also challenges several of the Hearing Officer's findings of fact, arguing that they are unsupported by the record. (See Pl.'s Resp., Doc. No. 10, pp. 23-25.) The District's arguments either concern details that are immaterial to the Hearing Officer's decision, or challenge the Hearing Officer's credibility determinations. None of their arguments are sufficient to warrant reversal of the Hearing Officer's decision.

We consider in turn whether the Hearing Officer committed error in finding that the District violated its Child Find obligation, or in awarding K.C. compensatory education and reimbursement.

### A.     Hearing Officer's Finding of a Child Find Violation

The District has challenged both the legal and factual correctness of the Hearing Officer's conclusion that it violated its Child Find obligation.  It argues that the decision was legally erroneous because the Hearing Officer improperly faulted the District for relying upon grade-level benchmarks, and failed to consider whether K.C. was actually in need of special educational services in second or third grade when he was showing progress with only general accommodations.  The District also argues that the record clearly demonstrates, contrary to the Hearing Officer's conclusions, that it did not overlook K.C.'s educational needs.  Rather, the District claims that it paid special attention to K.C.'s academic development by providing general accommodations that allowed K.C. to progress, and demonstrate that he was not in need of special education during second, third or fourth grades.  (Pl. Mem., p. 7.)[5]

K.C. urges that the District's criticisms of the Hearing Officer's decision are misplaced.  He asserts that the Hearing Officer did not fault the District for considering grade-level benchmarks, but, rather, faulted it for relying only on those benchmarks.  K.C. argues that the Hearing Officer correctly found that the District's singular focus on whether K.C. was progressing toward meeting those benchmarks prevented it from considering other factors that

_____

[5] The District also challenges the Hearing Officer's conclusion that the evaluation conducted in March 2010 was inadequate.  (Pl. Mem., pp. 22-24.)  As we affirm the administrative finding that a Child Find violation had occurred as of February 16, 2009, resolution of this issue has no impact upon our analysis.  The adequacy of this evaluation is of particularly little weight given the District's reversal of its conclusion three months later after K.C.'s parents submitted independent neuropsychological and occupational therapy reports.

indicated K.C. might have a learning disability. K.C. also challenges the District's claim that his progress with general accommodations show that special education was unnecessary, noting that the duty to evaluate is triggered whenever there are grounds to suspect that a student has a learning disability.

The IDEA's Child Find provision requires states to ensure that "all children residing in the state who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located and evaluated." 20 U.S.C. 1412(a)(3). This provision places upon school districts the "continuing obligation . . . to identify and evaluate all students who are reasonably suspected of having a disability under the statutes." P.P. ex rel. Michael P. v. West Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009); see also 20 U.S.C. § 1412(a)(3). The evaluation of children who are suspected to be learning disabled must take place within a reasonable period of time after the school is on notice of behavior that is likely to reflect a disability. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 250 (3d Cir. 1999). The failure of a school district to timely evaluate a child who it should reasonably suspect of having a learning disability constitutes a violation of the IDEA, and a denial of access to a "free and appropriate public education" (FAPE). 20 U.S.C. § 1400.

If a student is evaluated and determined to have a qualifying learning disability, the district must provide an IEP under 20 U.S.C. § 1414(d) that is "'reasonably calculated' to enable the child to receive 'meaningful education benefits' in light of the student's 'intellectual potential.'" Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (quoting Polk v. Cent. Susquehanna Interm. Unit 16, 853 F.2d 171, 181 (3d Cir. 1988)). The IEP "must be sufficient to confer some educational benefit upon the handicapped child." L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006).

The Hearing Officer correctly applied these legal standards to K.C.'s educational history, and we see no reason to disagree with her conclusion that by spring of K.C.'s third grade year the District should have evaluated K.C. for a suspected learning disability. At that point, the supplemental educational accommodations provided to K.C. had steadily increased for more than two years, and K.C. nonetheless continued to struggle in the same academic areas. During K.C.'s second grade year he was provided educational accommodations in nearly every academic area, and attended more tutoring and small group sessions than any other student. (H.O. Op., FF ¶ 16; N.T., pp. 69-70; R. at J-4, J-5.) Despite these extraordinary educational accommodations, K.C.'s teacher reported in March that he continued to struggle with reading, language arts and handwriting, and K.C.'s end-of-year DRA testing showed he was significantly behind in fluency. (R. at J-15, J-18, P-1A.) Indeed, the District recognized the shortfalls of K.C.'s second-grade accommodations by providing him with even more supplemental assistance in third grade. (See H.O. Op., FF ¶ 20.) Based upon these facts, the Hearing Officer had a proper basis to conclude that there were clear signs that regular educational accommodations were not adequate as K.C. progressed from second to third grade. We agree with her conclusion that, by spring of K.C.'s third grade year, the District should have recognized those signs and evaluated K.C. for a learning disability.

We also disagree with the District's assertion that the Hearing Officer erred by faulting the District for relying upon grade-level benchmarks. It is true, of course, that schools may consider these benchmarks in evaluating a student's performance. See 34 C.F.R. § 300.309. The Hearing Officer did not find otherwise, but merely concluded that the District had relied too heavily on those benchmarks to the exclusion of other circumstances that indicated the presence of a disability. (H.O. Op., p. 15 ("The primary reason that a child find violation occurred in this

case was the District's <u>singular</u> focus on . . . grade level benchmarks." (emphasis added).)  The Hearing Officer correctly noted that the District was required to use a variety of assessment tools in considering whether K.C. might have a learning disability.  (<u>Id.</u>, pp. 16-17 (citing 20 U.S.C. § 1414(b)(2)).)

Finally, the District argues that the Hearing Officer failed to consider whether K.C. actually needed special education services in first through fourth grades.  We first note that this argument concerns damages, and does not directly bare upon whether the school district violated its obligations under the IDEA.  If a school district has reason to believe a student is disabled and improperly delays its evaluation, it has violated its Child Find obligation regardless of whether the student is eventually found to have a disability.  <u>G.D. v. Wissahickon Sch. Dist.</u>, 832 F.Supp.2d 455, 467-68 (E.D. Pa. 2011) (citing <u>P.P. v. West Chester Area Sch. Dist.</u>, 585 F.3d 727, 738 (3d Cir. 2009)).  If it is ultimately determined that the student is not disabled, and that the district has been providing an appropriate education, the violation is considered "procedural" and no award of compensatory education is appropriate.  <u>Id.</u>  Nonetheless, the undue delay by the school district is still considered a violation of the IDEA.

In any event, we find that, contrary to the District's allegation, the Hearing Officer did consider K.C.'s need for special education services in reaching her decision and award of benefits.  The Hearing Officer specifically found that the regular educational accommodations provided by the District, although extensive, were not sufficient.  (H.O. Op., pp. 18-19.)  Further, when K.C. was eventually evaluated, he was determined to suffer from multiple learning disabilities and to be in need of an IEP.  (R. at J-49.)  Indeed, Dr. Edward Moss, a neuropsychology, testified that K.C. had suffered from a language-based learning disability since

birth. (N.T., pp. 1071, 1084.) We find that the Hearing Officer appropriately considered these factors in finding that a violation occurred and that compensatory education was appropriate.

**B.  Hearing Officer's Award of Benefits**

To compensate K.C. for the District's failure to timely evaluate him for a learning disability and provide an appropriate IEP, the Hearing Officer awarded compensatory education in the form of ninety minutes of occupational therapy and individualized reading instruction per week for two full school years. (H.O. Op., p. 22.) Additionally, she awarded him partial reimbursement for the summer reading program he participated in following forth grade based upon her finding that the District improperly conditioned its offer of ESY services upon K.C.'s acceptance of an IEP for his fifth grade year. The District challenges both of these awards.

The District's principal argument is that the compensatory education awarded by the Hearing Officer violates the IDEA's two-year statute of limitations. See 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due process hearing within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint."). It asserts that the Hearing Officer's compensatory education award provided an hour-for-hour replacement of services that the school district should have provided, and that the statute of limitations precludes any such award that extends past the limitations period. Accordingly, the District argues that only one year and three months of compensatory education could legally be awarded to K.C., which would compensate him for services the District should have provided between February of third grade and the end of fourth grade.

Compensatory education is a judicially created remedy designed "to compensate the student for rights the district already denied . . . because the School District violated the statutory

19

rights while the student was entitled to them." Ferren C. v. Sch. Dist. of Phila., 612 F.3d 712, 717 (3d Cir. 2010) (quoting Lester H. v. Gilhood, 916 F.2d 865, 872 (3d Cir. 1990)). "[A] disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education." Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 250 (3d Cir. 1999). The award "should aim to place disabled children in the same position they would have occupied but for the school district's violations" by "replacing educational services the child should have received in the first place." Reid v. D.C., 401 F.3d 516, 518 (D.C. Cir. 2005) (cited with approval by Ferren C., 612 F.3d at 717-18). Normally, compensatory education is awarded "for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." Mary T. v. School Dist. of Phila., 575 F.3d 235, 249 (3d Cir. 2009) (quoting M.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 396 (3d Cir. 1996)).

An hour-for-hour replacement for the period of deprivation, however, is not the only appropriate method of calculating a compensatory education award. Reid, 401 F.3d at 523 (finding that "this cookie-cutter approach runs counter to both the 'broad discretion' afforded by the IDEA's remedial provision and the substantive FAPE standard that provision is meant to enforce.") Compensatory education is an equitable remedy, and requires the court to "consider all relevant factors." Ferren C., 612 F.3d at 718 (quoting Florence Cnty. Sch. Dist. v. Carter, 510 U.S. 7, 16 (1993)). Indeed, "[p]arsing out the exact number of hours a child was not benefitted by FAPE during the time period would place an arduous and near impossible task upon the administrative bodies." G.D. v. Wissahickon Sch. Dist., 832 F.Supp.2d 455, 468 (E.D. Pa. 2011).

In this case, the Hearing Officer did not use a mechanical hour-for-hour approach, but based her compensatory education award on the services necessary to provide the same qualitative educational benefit K.C. would have received had the District recognized his disability sooner. (H.O. Op., p. 22 (citing N.T., pp. 1109, 1110).)  In determining the award, the Hearing Officer relied upon Dr. Moss, who testified that it was important for K.C. to improve his reading ability and motor skills before entering middle school, where the academic requirements would be more demanding.  (N.T., p. 1110.)  In order for K.C. to adequately develop these skills, Dr. Moss opined that he should receive daily evidence-based reading instruction and three thirty-minute occupational therapy sessions per week.  (Id., pp. 1109-1111.)  Dr. Moss's evaluation had occurred approximately two years before K.C. would enter middle school, and therefore the Hearing Officer found it was appropriate for K.C. to receive these supports for that period of time.  (H.O. Op., pp. 22-23.)

It is apparent that the Hearing Officer properly fashioned her compensatory education award to put K.C. in the educational position he "would have occupied but for the school district's violations."  Reid, 401 F.3d at 518.  Contrary to the District's assertion, she did not use an hour-for-hour approach or enter an award which compensated K.C. for violations that may have occurred prior to the limitations period.  Accordingly, we find the District's argument to be without merit.[6]

---

[6] We also agree with the conclusion reached by several courts within this district, that the IDEA's statute of limitations does not apply to limit the permissible period of compensatory educational awards.  See Amanda A. v. Coatsville Area Sch. Dist., 2005 WL 426090, * 6 (E.D. Pa. Feb. 23, 2005) ("[T]here is no limitations period, whether equitable or legal, on a disabled child's claim for compensatory education pursuant to the IDEA."); Heather D. v. Northampton Area Sch. Dist., 511 F.Supp.2d 549, 554 (E.D. Pa. 2007); Robert R. v. The Marple Newtown Sch. Dist., 2005 WL 3003033, *3 (E.D. Pa. Nov. 8, 2005) (noting that "[s]ince Amanda A was

Finally, we find the District's challenge of the Hearing Officer's award of partial reimbursement for ESY services to be without merit as well. The District's Supervisor of Special Education specifically testified that she told K.C.'s parents that ESY services could not be provided until an IEP for the following year was in place. (N.T., p. 782.) The District does not dispute that K.C. was entitled to ESY services, and has not provided any justification for imposing this condition on its offer. The Hearing Officer properly found that by imposing this condition, the District caused K.C.'s parents to enroll him in a private summer program and avoided providing K.C. with ESY services. On this basis, it was proper to award K.C. reimbursement in the amount the District would have spent to provide him with ESY services had they not improperly conditioned them on his acceptance of an IEP for his fifth grade year.

## V.     Conclusion

For the foregoing reasons, we find no merit to the District's arguments challenging the Hearing Officer's decision or award of benefits. Accordingly, her decision will be affirmed.

An appropriate Order follows.

---

decided, five additional courts in the Eastern District of Pennsylvania have adopted Judge Padova's reasoning."). Accordingly, even if we agreed with the District that the Hearing Officer's compensatory education award was based upon an hour-for-hour replacement of services the District should have provided, it would not alter our conclusion that the award, as an equitable remedy, did not violate the statute of limitations.